IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CREATIVE MONTESSORI LEARNING CENTER, | ) ) ) | |
| Plaintiff, | ) ) | No. 09 C 3963 |
| v. | ) ) | Judge Robert W. Gettleman |
| ASHFORD GEAR, LLC, | ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Creative Montessori Learning Center, individually and on behalf of all others similarly situated, has brought a class action complaint against defendant Ashford Gear, LLC, alleging violations of the Telephone Consumer Protection Act, 42 U.S.C. § 227 ("TCPA") and conversion. Both counts are premised on the allegation that defendant sent, or authorized the sending of, an unsolicited facsimile advertisement to plaintiff and the class it represents.[1] On April 19, 2011, the court denied defendant's motion for summary judgment, concluding that whether defendant instructed B2B (the entity that conducted the alleged fax campaign) to send facsimiles only to a list of customers provided by defendant remained in dispute (Doc. 157). The parties have not conducted any further discovery since the court issued that order. Nonetheless, despite the continued existence of this contested issue of material fact, plaintiff has now moved for summary judgment on the TCPA count. For the reasons described below, plaintiff's motion is denied.

---

[1]The court has certified a class consisting of "all persons having no established business relationship with Ashford Gear, LLC who received one or more unsolicited faxes in June 2006 regarding the "Rollee Pollee" self-contained napping station, offering "order 30 Rollee Pollees by June 30, 2006 and Get 6 FREE!" and identifying (718) 360-0971 as the number to call to stop receiving faxes.

**FACTS**

As noted by the court in its April 19, 2011, order, few of the underlying facts of this case are undisputed. What is clear from the record is that defendant is a small business located in California that sells textiles, including a specialty blanket for preschoolers called the "Rollee Pollee." Sometime in 2006 defendant entered into some sort of an arrangement with a fax broadcasting company called "Business 2 Business Solutions" ("B2B"). That business was run by Caroline Abraham from her home in New York. Abraham worked with a Romanian company called Macaw which sometimes used the marketing name Maxileads. One of Macaw's or B2B's sales persons called himself Kevin Wilson and is Abraham's nephew.[2] Wilson somehow came into contact with Brian Reeves, one of defendant's owners. They had a series of telephone conversations in which they entered into an arrangement for B2B to conduct a fax advertising campaign for defendant. Reeves and defendant prepared a draft advertisement for the Rollee Pollee blanket that was to be faxed to potential pre-school customers of defendant. Reeves sent that draft advertisement to B2B. The ad went through several revisions, with B2B adding a legal disclaimer at the bottom, and a final version was ultimately approved by Reeves.

According to B2B records, it sent a first set of 5,362 faxes on June 7, 2006 and a second set of faxes on June 14-15, 2006. In total, the fax was sent 22,222 times to 14,579 persons and entities.

On June 27, 2006, the Florida Attorney General sent a "cease and desist" letter to defendant demanding that it stop sending illegal fax advertisements. Defendant faxed that letter

---

[2] Apparently "Kevin Wilson" is an alias, and his real name is Conor Melville. See Bridgeview Health Care Center Ltd. v. Clark, 2013 WL 1154206, *1 n.2 (N.D. Ill. Mar. 19, 2013).

to B2B. Reeves spoke with Wilson who explained why B2B thought the Florida Attorney General was incorrect. Defendant then informed the Florida Attorney General's office that its faxes were legal.

B2B did not follow its regular payment procedure in its dealings with defendant. Defendant sent to B2B one check payable to Maxileads in the amount of $28. The check was to pay for membership in B2B's "Priority Club," not for payment of any actual fax service. B2B's regular payment procedure was to send clients a "payment letter" instructing the client on what to pay, how to pay, and the number of faxes for which the client would pay. B2B made a record of sending that payment letter with a "PDate" entry in an electronic table kept by Abraham. There is no entry in that electronic table for defendant, suggesting that no such letter was sent. Defendant claims to have never received such a letter.

B2B typically required client approval before sending the faxes. The approval process consisted of an approval by the client of the advertisement, as well as payment. B2B was provided payment in three ways: (1) receipt of the payment itself; (2) a copy of a void check showing the client's bank information from which B2B would print a fax check to take payment; or (3) if the client was going to mail a check, B2B would request that a hard copy be faxed to it and B2B would take the customer's word that the check would be mailed.

It is undisputed that none of the three payment methods was followed in the instant case. Instead, without providing defendant an invoice, estimate or payment letter, B2B on June 7, 2006, faxed the ad to a list of fax numbers that B2B had purchased from a third party. The following day, without notice to defendant, Abraham created a check in the amount of $542 payable to B2B using defendant's bank information found on the $28 check made payable to

3

Maxileads. It is undisputed that defendant has never issued a check to B2B, and never specifically approved a broadcast to a list of potential recipients supplied by B2B. In fact, as noted in the court's April 19, 2011, order, Reeves testified that he expected B2B to send the faxes to a customer list he had provided, but could not identify that list, where it came from, when it was produced, or when he "gave it" to B2B. B2B has no electronic record of ever receiving such a list.

On June 14, 2006, B2B sent a second fax campaign to over 19,000 fax numbers. That same day Abraham prepared a second check payable to B2B in the amount of $792 using the bank information from defendant's check to Maxileads. Defendant instructed its bank to refuse payment on that check. The bank returned the check to B2B and assessed a service charge. Defendant has never paid for the second set of faxes.

## DISCUSSION

Summary judgment is appropriate only when the material facts are undisputed and demonstrate that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of asserting the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986), and must support that assertion by citing to materials in the record. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Plaintiff moves for summary judgment on its TCPA claim. To prevail on this claim plaintiff must show that: (1) defendant used a telephone facsimile machine, a computer or other device to send one or more faxes to plaintiff's facsimile machine; (2) the faxes sent contain

4

materials advertising the commercial availability or quality of any property, goods, or services; and (3) plaintiff did not give prior express invitation or permission for defendant to send the faxes." Hinman v. M and M Rental Ctr., Inc., 596 F. Supp.2d 1152, 1158 (N.D. Ill. 2009).

Defendant challenges plaintiff's ability to establish the first element.[3] Obviously, defendant itself did not actually send the faxes. Thus, defendant argues that plaintiff must, but cannot, establish that defendant is vicariously liable for B2B's actions.

Plaintiff argues that defendant is liable as the sender because the faxes were sent on its behalf, citing 47 C.F.R. § 64.1200(f)(8), which defines a sender as "[t]he person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." FCC regulations state that under the TCPA "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the ruling banning unsolicited facsimile advertisements. In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, F.C.C. R. 12391, 12407 (Aug. 7, 1995). Courts in this district have relied on the FCC's interpretation "to conclude that defendants cannot escape liability simply by hiring an independent contractor to send unsolicited facsimiles on their behalf." Bridgeview Health Care Center, 2013 WL 1154206 at *4 (and cases cited therein). The TCPA "creates a form of vicarious liability making an entity liable when a third party sends unsolicited communications on its behalf in violation of the Act." Id.

---

[3]There is no dispute that one or more faxes were sent, that the faxes advertise defendant's goods, or that the plaintiff did not give prior express permission for defendant to send the faxes. Defendant does challenge plaintiff's computation and evidence as to the actual number of faxes sent.

5

Plaintiff argues that, once B2B became defendant's agent for any purpose, the TCPA confers strict liability for all facsimiles sent on defendant's behalf. Defendant counters that § 277b of the Act incorporates rather than abrogates basic agency principles, meaning that the TCPA makes the entity liable only for facsimiles sent within the agent's scope of authority.

This court agrees with defendant's position. In particular, the court agrees with Magistrate Judge Valdez's thoughtful analysis reaching that conclusion in Broadview Health Care Center, Id. at *5. As correctly noted in Bridgeview Health Care Center, "nothing in the language of § 227(b) indicates that notions of agency law are not applicable." Id. Indeed, since Broadview Health Care Center was issued, the FCC has confirmed that construing the "prohibitions contained in § 227(b) to incorporate agency principles" is consistent with its own administrative precedent. In the Matter of Joint Petition Filed by Dish Network LLC, 28 F.C.C. R. 6574, 6589 ¶ 38 ("Dish Network").

Plaintiff relies on ¶¶ 46 and 47 of Dish Network to support its argument that defendant is vicariously liable based simply on its approval of the contents of the advertisement. In particular, plaintiff argues that ¶46 indicates that apparent authority may be shown by evidence that the seller approved, wrote, or reviewed the outside entity's telemarketing scripts, and that evidence of this kind "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the Seller's authorized agent." Those two paragraphs in Dish Network are offered for guidance only, however, and the FCC has agreed that they have no binding effect on courts, are not entitled to deference under Chevron USA Inc. v. NRDC, Inc., 467 U.S. 838 (1984), and that their

6

"force is dependent entirely on [their] power to persuade." <u>Dish Network LLC v. Federal Communications Commission</u>, __ Fed. Appx. ___, 2014 WL 323660 (D.C. Cir. 2014).

Whatever persuasive power the two guideline paragraphs possess does not carry the day for plaintiff's position. Paragraph 47 demonstrates the problem in the instant case by indicating "we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under § 227(b). However, we see no reason that a seller should not be liable under [§ 227(b)] . . . <u>when it has authorized</u> the telemarketer to market its goods or services." (Emphasis added)

As noted previously, the issue of what consent, if any, Reeves gave to B2B to send any of the faxes remains hotly contested. Plaintiff argues that simply by approving the final version of the ad and discussing sending a list to B2B of persons who had previously given consent to receive the ad demonstrates that B2B had apparent authority when it acted, at least from the vantage of the recipients. Plaintiff's argument begs the question. Plaintiff could not act with apparent authority if it never had any authority to act. And there is a genuine dispute as to whether defendant ever authorized B2B to start the faxing process. Defendant never sent B2B a check for payment, or ever authorized Abraham to create her own checks, and Abraham testified that receipt of payment was the final step in the approval process.

Plaintiff also argues that defendant ratified B2B's actions when defendant spoke with the Florida Attorney General's office and indicated its position that the faxes were legal. Yet, there simply is no undisputed evidence to support plaintiff's theory that defendant ratified B2B's actions. It is unclear whether Reeves knew B2B had sent faxes to customers other than to the list

7

he claims to have given it, and defendant outright refused to pay for the second set of faxes, indicating its lack of consent or ratification.

Consequently, because a genuine issue remains as to what, if any, authorization defendant ever gave to B2B to act in any capacity, plaintiff has not established vicarious liability. Plaintiff's motion for summary judgment is denied.

## **CONCLUSION**

For the reasons described above, plaintiff's motion for summary judgment is denied. This matter is set for a report on status on April 2, 2014, at 9:00 a.m.

**ENTER:** March 3, 2014

_____
**Robert W. Gettleman**
**United States District Judge**